**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | **MISC. NO.** |
| v. : | |
| : | **Filed Under Seal** |
| **JANET OLATIMBO AKINDIPE,** : | |
| : | |
| **Defendant.** : | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

**I.  IDENTITY OF THE AFFIANT**

I, Andre L. Jacobs II, being duly sworn, state:

1. I am a Special Agent of the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"). From 2016 to the present, I have been assigned to the Philadelphia Region, which incorporates the District of Columbia ("D.C."). My agency specifically focuses on investigations involving health care fraud and other related health care crimes. My investigative focus over the past two years has been fraud committed against federal health care programs. I have received training in general law enforcement and criminal investigations, and I have attended training programs focused on health care crimes. I have investigated allegations of health care fraud, false claims, and drug diversion. In the course of conducting these investigations, I have participated in all the normal methods of investigations, including but not limited to visual surveillance, electronic surveillance, interviewing informants and cooperating witnesses, conducting physical surveillance, consensual monitoring and recording of both telephonic and non-telephonic communications, and executing search warrants. Prior to becoming a federal special agent, I worked as a federal police officer with the United States Park Police. As a federal police officer, I investigated violations stemming from traffic violations, narcotics, assaults, and theft. Prior to becoming a federal police officer, I worked as a police officer

1

with the city of Hopkinsville, Kentucky.  As a police officer, I investigated a variety of crimes including but not limited to fraud, assaults, shootings, theft, burglaries, abuse, and drugs.  I participated in several methods of investigations, including but not limited to, undercover operations, visual and electronic surveillance, executing both arrest and search warrants, conducting custodial interviews, as well as interviews with witnesses and informants, and collecting and preserving evidence.

2. I am assigned to this investigation and my involvement has included, but is not limited to, interviewing witnesses, conducting surveillance, and reviewing Medicaid billing claims and medical records associated with Medicaid recipients.

II.     **REASON FOR AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint and arrest warrant charging JANET OLATIMBO AKINDIPE ("AKINDIPE") with violations of 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. §1035 (Health Care False Statements).

4. AKINDIPE resides in Laurel, Maryland.  Since approximately November 1, 2014 through the present, AKINDIPE has been employed as a Personal Care Aide ("PCA") providing home health care services to residents of the District of Columbia that receive Medicaid. AKINDIPE uses a unique National Provider Information ("NPI") number to submit timesheets to home health agencies ("HHA"), which in turn bill Medicaid and pay AKINDIPE.

5. In or around September 2018, HHS-OIG, the Federal Bureau of Investigation ("FBI") and the D.C. Medicaid Fraud Control Unit ("MFCU") identified AKINDIPE as a PCA potentially submitting fraudulent timesheets and opened an investigation into allegations that AKINDIPE had defrauded and was continuing to defraud D.C. Medicaid by submitting and causing to be submitted false claims concerning the provision of PCA services.

6. The investigation confirmed those allegations, revealing that AKINDIPE obtained an NPI number ending in 3930 and that false claims were submitted under her name and NPI number. The false claims can be categorized broadly as follows: (1) claims purporting that AKINDIPE provided services to Medicaid beneficiaries when it would be impossible to do so; (2) claims purporting that AKINDIPE provided services to Medicaid beneficiaries while she was not in the United States; and (3) claims purporting that AKINDIPE provided services to Medicaid beneficiaries to whom she provided no care at all.

7. The claims data further showed that, at various times between at least November 1, 2014, and the present, AKINDIPE was employed by approximately six HHAs: HHA-1 through HHA-6 (collectively the "six HHAs"). The six HHAs were registered to do business in the District of Columbia to provide home health care services to Medicaid beneficiaries. AKINDIPE purported to provide PCA services for at least four Medicaid beneficiaries during this time period.

8. Since in or around March 2013, AKINDIPE has worked as a full-time employee for the United States Department of Health and Human Services. AKINDIPE currently works as a Patient Care Technician at the National Institutes of Health ("NIH") Clinical Center in Bethesda, Maryland. AKINDIPE generally works twelve-hour shifts at NIH.

9. The facts and information contained in this affidavit are based on my personal knowledge of the investigation and the observations and reports of other law enforcement officers. This affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts, which are necessary to establish that probable cause exists.

### III. OVERVIEW OF DISTRICT OF COLUMBIA MEDICAID PROGRAM AND HOME HEALTH CARE SERVICES

10. Medicaid is a "health care benefit program" as defined by 18 U.S.C. § 24(b). It was established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid was overseen and administered by the Centers of Medicare and Medicaid Services ("CMS"), an agency within HHS. The federal government provides the funding for 70 to 80 percent of Medicaid, and the District provides the remaining funds. Through September 30, 2008, Medicaid was administered by the D.C. Department of Health's Medical Assistance Administration; however, since October 1, 2008, Medicaid has been administered by the Department of Health Care Finance ("DHCF"), which is located in Northwest Washington, D.C.

11. D.C. Medicaid provides health insurance coverage to residents of the District of Columbia whose incomes are below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by Medicaid are referred to as "beneficiaries." In the District of Columbia, a beneficiary is assigned a D.C. identifier ("DCID"), a unique eight-digit number that is used to bill Medicaid for services provided to the beneficiary.

12. In the District of Columbia, HHAs can provide certain services including skilled nursing, home health aide, and personal care services. Personal care services are intended to assist Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs include the ability to get in and out of bed, bathe, dress, eat, take medication prescribed for self-administration, and engage in toileting.

13. To be eligible to participate in Medicaid, HHAs must agree to abide by all federal and local laws, regulations, and program manuals governing Medicaid reimbursements. To receive reimbursement from Medicaid, HHAs operating in the District of Columbia are required to submit a claim, either electronically or in paper form, to DHCF. As part of the claim, an HHA must

provide certain information, such as the name of the Medicaid beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was provided, and the amount of money being claimed by the HHA as payment from Medicaid. Medicaid only pays for services that are medically reasonable and necessary, and that are actually provided as claimed.

14. HHAs employ and contract with personal care aides to provide services to Medicaid beneficiaries. Under the Medicaid rules, a PCA must meet certain qualifications, including: (a) being at least 18 years of age; (b) being a citizen of the United States or an alien who is lawfully authorized to work in the United States; (c) completing a home health aide training program that involves at least seventy-five hours of classroom training with at least sixteen hours devoted to supervised practical training; (d) passing a competency evaluation for the services which the PCA is required to perform consistent with the requirements set forth in 42 C.F.R. § 484.36; (e) obtaining certification in cardiopulmonary resuscitation and maintaining such certification annually; (f) demonstrating that the PCA is free from communicable disease as confirmed by an annual PPD Skin Test or documentation from a primary care physician stating that the person is free from communicable disease; and (g) passing a criminal background check. PCAs are issued a unique 10-digit NPI number, which the HHA uses to bill Medicaid for services rendered to a beneficiary based on timesheets submitted by the PCA.

15. To receive personal care services under Medicaid, a beneficiary must obtain a prescription from a doctor, informally known as an "intake." Medicaid only pays for personal care services if the doctor determines after a face-to-face physical examination that the beneficiary has functional limitations in one or more ADLs. DHCF regulations that went into effect in November 2013 clarified that the doctor prescribing the intake must be the beneficiary's primary care physician with whom the beneficiary had a pre-existing doctor-patient relationship.

16. A beneficiary takes the intake to an HHA, which in turn arranges for a registered nurse to perform an initial assessment of the beneficiary's functional status and needs. The nurse drafts a Plan of Care ("POC") for the beneficiary based on the assessment. The POC is required to specify the frequency, duration, and expected outcome of the personal care services and is supposed to be tailored to address the individual needs of the beneficiary.

17. The HHA then assigns a PCA to provide the personal care services set forth in the POC to the beneficiary. Services typically are provided in the beneficiary's home and PCAs must document the provided care on a timesheet that is submitted to the HHA. The timesheet is supposed to reflect accurately the date the PCA provided services, the itemized services rendered, the amount of time spent providing each service, and the location at which the services were provided. Timesheets are supposed to be signed each day by both the PCA and the beneficiary. However, a single timesheet can contain a full week of services. HHAs use the timesheets to determine and justify the hours of services for which the HHA files a reimbursement claim with Medicaid.

18. As outlined in Section 6.3, Interrelationship of Providers, of the D.C. Medicaid MMIS Provider Billing Manual, "Providers are prohibited from referring or soliciting beneficiaries directly or indirectly to other providers for financial consideration. Providers also are prohibited from soliciting, receiving or offering kickbacks; payments, gifts, bribes, or rebates for purchasing; leasing, ordering, arranging for, recommending purchasing, leasing; ordering for goods, facilities, or items for which payment is made through the D.C. Medicaid Program."

### IV.  FACTS SUPPORTING PROBABLE CAUSE

19. As mentioned above, this investigation has revealed that AKINDIPE submitted or caused to be submitted false timesheets to several HHAs for payment of PCA services not rendered

6

to beneficiaries. The HHAs subsequently sought and received payments from D.C. Medicaid based on AKINDIPE's fraudulent timesheets.

20. During the investigation, law enforcement obtained the following: AKINDIPE's HHA employment records, her Department of Health and Human Services employment records, patient files, and D.C. Medicaid billing claims submitted with her NPI number. Law enforcement also interviewed witnesses and conducted surveillance.

### A. Billing in Excess of Twenty Hours in a Given Day

21. An analysis of AKINDIPE's NIH time and attendance records and HHA timesheets revealed that on approximately 338 occasions between January 1, 2015, and October 25, 2018, AKINDIPE claimed to work 20 or more hours in a single day. On these days, in addition to working her shift at NIH, she asserted that she provided PCA services to at least one beneficiary. Three days—January 23, 2016, May 6, 2018, and August 12, 2018—provide non-exhaustive examples of AKINDIPE's fraud.

22. On January 23, 2016, AKINDIPE's NIH time and attendance records show her working a sixteen-hour shift from 3:00 PM to the next morning at 7:00 AM. However, Medicaid claims data show her causing Medicaid to be billed for 56 units (14 hours) of PCA services that she purportedly provided to B-1 and B-2, associated with HHA-1, that same day. Her HHA-1 timesheets claim she provided eight hours of PCA services to B-1 from 7:00 AM to 3:00 PM and six hours of services to B-2 from 5:30 PM to 11:30 PM.[1]

23. Similarly, AKINDIPE caused D.C. Medicaid to be billed for 56 units (14 hours) of PCA services that she purportedly provided to B-1 and B-2 on both May 6, 2018 and August 12,

---

[1] The start time on the January 23, 2016, B-2 timesheet actually appears to be "3:30" and not "5:30," but the end time is listed as "11:30," and the timesheet states that only six hours of PCA services were performed. Moreover, HHA-1 only billed Medicaid for six hours of PCA care that AKINDIPE allegedly provided B-2 that day. The timesheet does not specify whether the shift took

2018. Her NIH time and attendance records show her working a twelve-hour NIH shift starting on both dates at 7:00 PM to 7:00 AM the next day. Yet, her May 6, 2018, HHA-1 timesheets show her claiming to have provided eight hours of PCA services to B-1 from 7:00 AM to 3:00 PM and six hours of services to B-2 from 3:30 PM to 9:30 PM.[2] Her August 12, 2018, HHA-1 timesheets show her providing eight hours of PCA services to B-1 from 7:00 AM to 3:00 PM and six hours of PCA services to B-2 from 4:00 PM to 10:00 PM.  Table 1 provides more details about her fraudulent conduct for all three days.

| Date of Service | Beginning Time | End Time | Employer | Beneficiary | Hours of Work Claimed | Amount Paid to HHA |
|---|---|---|---|---|---|---|
| **Jan. 23, 2016** | 7:00 AM | 3:00 PM | HHA-1 | B-1 | 8 | $160.64 |
| | 5:30 $PM^2$ | 11:30 $PM^2$ | HHA-1 | B-2 | 6 | $120.48 |
| | 3:00 PM | 7:00 AM | NIH | N/A | 16 | N/A |
| | | | | | | |
| **May 6, 2018** | 7:00 AM | 3:00 PM | HHA-1 | B-1 | 8 | $164.48 |
| | 3:30 $PM^2$ | 9:30 $PM^2$ | HHA-1 | B-2 | 6 | $123.36 |
| | 7:00 PM | 7:00 AM | NIH | N/A | 12 | N/A |
| | | | | | | |
| **Aug. 12, 2018** | 7:00 AM | 3:00 PM | HHA-1 | B-1 | 8 | $164.48 |
| | 4:00 PM | 10:00 PM | HHA-1 | B-2 | 6 | $123.36 |
| | 7:00 PM | 7:00 AM | NIH | N/A | 12 | N/A |
| **Total Amount Paid to HHA-1** | | | | | | $856.80 |

**B. Billing While Outside of the United States**

24.     The investigation also revealed that AKINDIPE caused Medicaid to be billed for services she allegedly provided when she was outside of the United States.

25.     From September 27, 2016, through October 12, 2016, AKINDIPE claimed to provide PCA services to B-1, B-2, and B-5, resulting in D.C. Medicaid issuing payments to HHAs

---

place in the morning or afternoon, but I believe the shift was in the afternoon based on other timesheets for B-2. Regardless, both an evening shift and a morning shift would have overlapped either with the hours AKINDIPE allegedly provided PCA services to B-1 or with her NIH shift.

[2] The timesheet does not specify whether the shift took place in the AM or PM.

8

totaling approximately $2,515. However, AKINDIPE was not in the United States on those days. Travel records show her flying from Washington Dulles International Airport to Dubai on September 26, 2016, and returning on October 13, 2016.

26. From April 9, 2018, through April 23, 2018, AKINDIPE claimed to provide PCA services to B-1, B-2, B-3, and B-4[3], resulting in D.C. Medicaid issuing payments to HHAs totaling approximately $3,412. However, AKINDIPE was not in the United States on those days. Travel records showed AKINDIPE flying from Washington Dulles International Airport to Dubai on April 8, 2018, and returning on April 24, 2018.

27. From June 4, 2019, through June 12, 2019, AKINDIPE claimed to provide PCA services to B-3 and B-4, resulting in D.C. Medicaid issuing payments to HHAs totaling approximately $2,016. AKINDIPE was not in the United States on those days. Travel records showed AKINDIPE flying from Washington Dulles International Airport to Dubai on June 3, 2019, and returning on June 13, 2019.

### C. Billing for Services Not Rendered While Under Surveillance

28. Law enforcement conducted surveillance of AKINDIPE on February 28, 2019, April 4, 2019, and June 25, 2019, days when she claimed to have provided PCA services to B-1 even though it was physically impossible for her to have done so.

i. February 28, 2019

29. On February 28, 2019, at approximately 7:33 AM, AKINDIPE departed NIH in Bethesda, Maryland, driving an SUV bearing a Maryland license plate number that was registered

---

[3] On September 20, 2018, law enforcement agents interviewed B-4 at his/her residence. B-4 said his/her current PCA was "Janet" and that she provided him/her with five hours of service five days a week. B-4 said Janet provided services in the afternoon. When asked if Janet always came to work and whether she paid B-4, B-4 became angry and started yelling and cursing at the agents and told them to get out of his/her house.

to her. She drove to B-3's residence in the District of Columbia, where she arrived at approximately 8:23 AM. AKINDIPE went inside the residence briefly before leaving at approximately 8:38 AM. After running some errands, she ultimately arrived at her home in Laurel, Maryland at approximately 9:18 AM. Law enforcement terminated surveillance at approximately 10:00 AM. AKINDIPE's HHA-4 timesheet falsely claimed that she provided B-3 with PCA services from 7:00 AM to 3:00 PM that day. As a result, D.C. Medicaid issued a $168 payment to HHA-4 for eight hours of PCA services that AKINDIPE purportedly rendered to B-3 that day.

### ii. April 4, 2019

30. On April 4, 2019, at approximately 7:35 AM, AKINDIPE left NIH in her vehicle. She ran some errands before ultimately arriving at her residence in Laurel, Maryland at approximately 9:37 AM. She parked her car in the driveway in front of her garage. At approximately 10:16 AM, she got out of the car and went inside her home. Agents left her residence at approximately 12:05 PM and returned at approximately 2:00 PM. Her SUV was still parked at the residence. Despite not being at B-3's residence while under surveillance, AKINDIPE caused D.C. Medicaid to issue a $168 payment to HHA-4 for eight hours of PCA services that she purportedly provided to B-3 from 7:00 AM to 3:00 PM that day.

### iii. June 25, 2019

31. On June 25, 2019, at approximately 7:50 AM, AKINDIPE left NIH in Bethesda, Maryland, and drove home. At approximately 8:41 AM, she arrived at her residence and parked her SUV in front of the garage. She got out of the vehicle at approximately 8:54 AM, walked into her garage, and then closed the garage door. Law enforcement took several breaks from surveillance after AKINDIPE enter her home, but saw her car still parked in front of the residence at 11:13 AM, 12:00 PM, and 2:30 PM. Law enforcement terminated surveillance at 2:51 PM.

Despite not being at B-3's residence while under surveillance, AKINDIPE caused D.C. Medicaid to issue a $168 payment to HHA-4 for eight hours of PCA services that she purportedly provided to B-3 from 7:00 AM to 3:00 PM that day.

### D. WAGE HISTORY

32. An examination of available wage history records for three of the HHAs that employed AKINDIPE showed her earning the following:

| TABLE 3 | | |
|---|---|---|
| **Reported Earnings Year** | **Home Health Agencies** | **Approximate Reported Earnings** |
| 2014 | HHA-2 | $16,909 |
| 2015 | HHA-2 | $28,668 |
| 2016 | HHA-1, HHA-2 | $27,014 |
| 2017 | HHA-1, HHA-3 | $35,190 |
| 2018 | HHA-1, HHA-3 | $26,866 |
| **Total:** | | $136,647 |

## IV. CONCLUSION

33. Based upon the facts contained in this affidavit, your affiant believes there is probable cause to issue an arrest warrant for JANET OLATIMBO AKINDIPE for violating 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1035 (Health Care False Statements).

_____
Special Agent Andre L Jacobs II
Department of Health and Human Services,
Office of Inspector General

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on June 22, 2020.

_____
Robin M. Meriweather
United States Magistrate Judge